**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | |
|---|---|
| **KEATON PURSELL,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | )   **No. 4:19-CV-2150 PLC** |
| | ) |
| **ANDREW SAUL,[1]** | ) |
| **Commissioner of Social Security,** | ) |
| | ) |
| **Defendant.** | ) |

**MEMORANDUM AND ORDER**

Plaintiff Keaton Pursell seeks review of the decision of Defendant Social Security Commissioner Andrew Saul, denying his applications for child insurance benefits and Supplemental Security Income (SSI) under the Social Security Act.  For the reasons set forth below, the Court affirms the Commissioner's decision.

**I.      Background**

Plaintiff, then twenty-six years old, applied for child insurance benefits in June 2016 and SSI in July 2016 alleging he was disabled as of November 2005 as a result of anxiety disorder and depression.  (Tr. 53, 141-49)  The Social Security Administration (SSA) denied Plaintiff's claims, and he filed a  timely request for a hearing before an administrative law judge (ALJ).  The SSA granted Plaintiff's request for review and conducted a hearing in June 2018, at which Plaintiff, Plaintiff's mother, and a vocational expert testified.

In a decision dated October 17, 2018, the ALJ applied the five-step evaluation set forth in 20 C.F.R. §§ 404.1520(a), 416.920(a) and concluded that Plaintiff "has not been under a disability,

---

[1] Andrew Saul is now the Commissioner of Social Security and is automatically substituted pursuant to Fed. R. Civ. P. 25(d).

as defined in the Social Security Act, from November 4, 2005 through the date of this decision."
(Tr. 14-21)  Plaintiff filed a request for review of the ALJ's decision with the SSA Appeals
Council, which denied the request.  (Tr. 1-6)  Plaintiff has exhausted all administrative remedies,
and the ALJ's decision stands as the Commissioner's final decision.  Sims v. Apfel, 530 U.S. 103,
106-07 (2000).

## II.      Evidence Before the ALJ

Plaintiff was twenty-seven years old, had an eighth-grade education, and lived with his
parents and girlfriend.  (Tr. 29)  Plaintiff testified that, when he was in ninth grade, he "was having
panic attacks just [at] the thought of putting my shoes on, so panic attacks every morning, [I] was
not able to go."  (Tr. 33-34)  Plaintiff attempted "some other methods of doing high school," which
"sort of worked, but wasn't going to work out long term. There were I think minimum hour
requirements[,] which that was going to be rough."  (Tr. 34)  Plaintiff also attended classes at a
community college, earning As "at least a little while," but he quit due to "panic."  (Tr. 34-35)

Plaintiff testified that he worked from home on a "game project" for "[a] couple of years
maybe," but "eventually they felt I needed to step it up to keep being part of the team and I guess
that caused me to have trouble to keep [working], so I stopped."  (Tr. 32)  Plaintiff never
successfully created a video game because "I usually run into some sort of difficulty and don't
know how to proceed exactly and end up giving up and moving on to something else."  (Tr. 39)

Plaintiff testified that he experienced panic episodes "probably weekly at least," but he had
"gotten better at keeping them sort of controlled … not quite as out of hand…. If I have anything
expected coming up, that makes it much more difficult."  (Tr. 35)  His panic episodes made "it
very difficult to really focus on much of anything…."  (Tr. 35)  Plaintiff explained that he had

"some" problems concentrating, explaining, "I find it easier to focus if I'm really interested in something, but if not it can be difficult to maintain that focus."  (Tr. 38)

Plaintiff had difficulty bathing consistently and generally bathed once a week.  (Tr. 35-36)  In the past, Plaintiff did not take care of his teeth but, after requiring and undergoing significant dental work, he brushed his teeth every night.  (Tr. 36)  Plaintiff spent most of his day "playing video games or occasionally trying to mod[ify] them or make them."  (Tr. 38-39)  Plaintiff "struggled with food, the food preparation, and eating enough," and relied on others to remind him to eat.  (Tr. 40-41)  He explained, "It's a lot of work and I don't always feel all that hungry even if I haven't had much to eat.  There's an element of depression there."  (Tr. 41)

Plaintiff testified that he rarely left his house except to attend his psychiatric appointments "once every few months."  (Tr. 36)  He also accompanied his girlfriend on errands "once in a while," but he waited in the car because it "fe[lt] difficult to go in there.  It's also panic [i]nducing."  (Tr. 27-38)  Plaintiff occasionally attended "small family thing[s]…, but that's difficult."  (Id.)  He did not celebrate Thanksgiving or Christmas with his family the previous year because "[i]t's too much, too difficult and triggers panic."  (Tr. 37)  Plaintiff used to have a driver's license, but he did not renew it "[b]ecause of the anxiety."  (Tr. 39)

Plaintiff's mother, Mrs. Pursell testified that Plaintiff stopped attending high school because he "stopped being able to put on his shoes to go to school and he would lie on the couch and roll up.  He wouldn't speak to anyone.  We couldn't do anything to convince him."  (Tr. 43)  Mrs. Pursell stated that Plaintiff successfully completed one semester of community college, even making the Dean's list, but the second semester "he couldn't get dressed.  He couldn't – he stopped bathing and brushing his teeth.  He just couldn't leave the house."  (Tr. 43-44)

Mrs. Pursell testified that Plaintiff did not interact with anyone other than his girlfriend. (Tr. 44)  She explained, "If you ask to speak to him, he will indicate some impatience with that, although [he] is civil and he then – he doesn't make eye contact or turn to face to you.  He faces away from you and answers minimally, in one or two words at a time." (Tr. 44)  Plaintiff did not attend family gatherings because he became very anxious, "He's tense.  He shakes.  Even when he indicates that he'd like to go, he's never ready on time." (Id.)

In regard to Plaintiff's past work on the computer game project, Mrs. Pursell stated that "[h]e actually did complete part of one project and they paid him once.  And then when they asked him to continue to work on the same project, he proved unable to do so.  At first he said yes, but then he just would never work on it and eventually he explained to the CEO of the company that he was too anxious to go on." (Tr. 45)

Mrs. Pursell testified that, over the last year, Plaintiff's personal care had improved "a little bit" with the encouragement of his girlfriend. (Tr. 45)  However, he bathed and brushed his teeth "very seldom." (Id.)  Mrs. Pursell explained "[h]is hair is usually dirty and sometimes very smelly …. In fact[,] our furniture has started to smell because of it." (Tr. 45)  Plaintiff ate "as little as he can get by with," and "he won't get up and get [food] for himself.  He'll fast until someone else will get [food] for him." (Id.)  Mrs. Pursell did not believe Plaintiff could live independently because he was "not able to interact with people enough to arrange [a job]" and "he wouldn't wash his clothing or eat unless someone brought food to his chair.  And he has difficulty sleeping because he awakens with anxiety and need[s] someone to soothe him back to sleep." (Tr. 47)

A vocational expert also testified at the hearing. (Tr. 48-52)  The ALJ asked the vocational expert to consider a hypothetical individual with Plaintiff's age, education, and no past relevant work, who was able to perform work at all exertional levels "limited to simple, routine tasks of

few changes in work setting with only infrequent and superficial interaction with supervisors, coworkers, and no contact with the general public, no tandem tasks." (Tr. 49)  The vocational expert responded that such an individual could perform the jobs of hand packer, laundry and dry cleaning worker, and janitor. (Tr. 49-50)  However, when the ALJ added the limitation of "only occasional [interaction] with supervisors, no coworkers, no general public," the vocational expert stated that there would not be any jobs available for that individual. (Tr. 50)  The vocational expert also stated that if the hypothetical individual either was off task more than ten percent of the workday or missed more than one day of work per month, he would be unable to maintain competitive employment. (Id.)

In regard to Plaintiff's medical records, the Court adopts the facts that Plaintiff set forth in his statement of uncontroverted material facts, as admitted by the Commissioner. [ECF Nos. 19, 22-1]  The Court also adopts the facts contained in the Commissioner's statement of additional material facts because Plaintiff does not dispute them. [ECF No. 22-2]

### III.      Standards for Determining Disability Under the Social Security Act

To be eligible for benefits under the Social Security Act, a claimant must prove he or she is disabled. Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001). To be entitled to child's insurance benefits on the earnings record of a parent, a claimant over the age of eighteen must have a disability that began before he or she turned 22 years old. See 42 U.S.C. § 402(d)]; 20 C.F.R. § 404.350(a)(5). The Social Security Act defines as disabled a person who is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A); 1382c(a)(3)(A). See also Hurd v. Astrue, 621 F.3d 734, 738 (8th Cir. 2010). The impairment must

be "of such severity that he [or she] is not only unable to do his [or her] previous work but cannot, considering his [or her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he [or she] lives, or whether a specific job vacancy exists for him [or her], or whether he [or she] would be hired if he [or she] applied for work."  42 U.S.C. §§ 423(d)(2)(A); 1382c(a)(3)(B).

Eligibility for disability benefits under the Social Security Act ("Act") requires a claimant to demonstrate that he or she suffers from a physical or mental disability.  42 U.S.C. §§ 423(a)(1), 1382(a)(1).  To be entitled to child's insurance benefits on the earnings record of a parent, a claimant over the age of eighteen must have a disability that began before he or she turned 22 years old.   See 42 U.S.C. § 402(d); 20 C.F.R. § 404.350(a)(5).  The Act defines disability as "the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period not less than 12 months."  20 C.F.R. §§ 404.1505(a), 416.905(a). The impairment must be "of such severity that [the claimant] is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy ...."  42 U.S.C. §§ 423(d)(2)(A); 1382c(a)(3)(B).

To determine whether a claimant is disabled, the Commissioner engages in a five-step evaluation process.   See 20 C.F.R. §§ 404.1520(a), 416.920.  Those steps require a claimant to first show that he or she is not engaged in substantial gainful activity.   Id.  Second, the claimant must establish that she has a "severe impairment," defined as "any impairment or combination of impairments which significantly limits [claimant's] physical or mental ability to do basic work

activities." Id. at § 404.1520(c).  "The sequential evaluation process may be terminated at step two only when the claimant's impairment or combination of impairments would have no more than a minimal impact on her ability to work."  Page v. Astrue, 484 F.3d 1040, 1043 (8th Cir. 2007) (quotation omitted).  At step three, the ALJ considers whether the Plaintiff's impairment meets or equals an impairment listed in 20 C.F.R., Subpart P, Appendix 1.  Id. at 404.1520(d).

Prior to step four, the Commissioner must assess the claimant's residual functional capacity (RFC), which is "the most a claimant can do despite [his or her] limitations."  Moore v. Astrue, 572 F.3d 520, 523 (8th Cir. 2009) (citing 20 C.F.R. § 404.1545(a)(1)).  RFC is defined as "the most a claimant can do despite her limitations."  Id. (citing 20 C.F.R. § 404.1545(a)(1)).

At step four, the ALJ determines whether the claimant can return to her past relevant work by comparing the claimant's RFC with the physical and mental demands of the claimant's past relevant work.  20 C.F.R. §§ 404.1520(f), 416.920(f); McCoy v. Astrue, 648 F.3d 605, 611 (8th Cir. 2011).  If the claimant can still perform past relevant work, she will not be found to be disabled; if the claimant cannot, the analysis proceeds to the next step.  McCoy, 648 F.3d at 611.

Through step four, the burden remains with the claimant to prove that he or she is disabled.  Moore, 572 F.3d at 523.  At step five, the burden shifts to the Commissioner to establish that, given the claimant's RFC, age, education, and work experience, there are a significant number of other jobs in the national economy that the claimant can perform.   20 C.F.R §§ 404.1520(g), 416.920(g);  Brock v. Astrue, 674 F.3d 1062, 1064 (8th Cir. 2012).  If the claimant cannot make an adjustment to other work, then she will be found to be disabled.  Id. at §§ 404.1520(g), 416.920(g).

**IV.    ALJ's Decision**

Applying the foregoing five-step analysis, the ALJ found that Plaintiff:  (1) had not engaged in substantial gainful activity since November 4, 2005, the alleged onset date; and (2) had the severe impairments of anxiety, depression, and adjustment disorder.  (Tr. 15)  At step three, the ALJ determined that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (Id.)  In determining whether Plaintiff's mental impairments were severe or met a Listing, the ALJ completed a psychiatric review technique (PRT), assessing Plaintiff's limitations in four broad areas of functioning.  The ALJ found that Plaintiff had:  (1) mild limitations in understanding, remembering, or applying information; (2) moderate limitation in interacting with others; (3) moderate limitations in concentrating, persisting, or maintaining pace; and (4) moderate limitations in adapting or managing oneself.  (Tr. 16)

The ALJ reviewed Plaintiff's testimony and medical records and determined that, while his "medically determinable impairments could reasonably be expected to cause the alleged symptoms," his "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record[.]" (Tr. 18)  The ALJ stated, for example, that Plaintiff's medications were effective, he had generally normal mental status exams, and his condition had improved.  (Id.)

The ALJ determined that Plaintiff had the RFC to perform a full range of work at all exertional levels with the following non-exertional limitations:  "[H]e is limited to simple routine tasks, with few changes in work setting.  He is limited to only infrequent and superficial interactions with supervisors and co-workers.  Further, he can have no interaction with the general public and no tandem tasks."  (Tr. 17)  Based on the vocational expert's testimony, the ALJ found that Plaintiff had no past relevant work but was able to perform jobs that existed in significant

numbers in the national economy, such as hand packer, laundry worker, and janitor.  (Tr. 20-21)  The ALJ therefore concluded that Plaintiff was not disabled.

## V.    Discussion

Plaintiff claims the ALJ erred in determining his RFC because the ALJ:  (1) failed to include limitations for Plaintiff's deficiencies in the area of concentration, persistence, and pace[2]; and (2) discounted the opinions of his treating psychiatrists.  [ECF No. 18]  The Commissioner counters that substantial evidence supported the ALJ's evaluation of Plaintiff's mental impairments and the ALJ's RFC finding.  [ECF No. 22]

### A.  Standard of Judicial Review

A court must affirm an ALJ's decision if it is supported by substantial evidence. 42 U.S.C. § 405(g).  "Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." Chesser v. Berryhill, 858 F.3d 1161, 1164 (8th Cir. 2017) (quoting Prosch v. Apfel, 201 F.3d 1010, 1012 (8th Cir. 2000)).  A court must consider "both evidence that supports and evidence that detracts from the ALJ's decision, [but it] may not reverse the decision merely because there is substantial evidence support[ing] a contrary outcome." Id. (quoting Prosch, 201 F.3d at 1012) (internal quotation marks omitted).

A court does not "reweigh the evidence presented to the ALJ, and [it] defer[s] to the ALJ's determinations regarding the credibility of testimony, as long as those determination are supported by good reasons and substantial evidence." Renstrom v. Astrue, 680 F.3d 1057, 1064 (8th Cir. 2012) (quoting Gonzales v. Barnhart, 465 F.3d 890, 894 (8th Cir. 2006)).  Therefore, a court must

---

[2] The phrase "concentration, persistence, or pace" refers to the "ability to sustain focused attention and concentration sufficiently long to permit the timely and appropriate completion of tasks commonly found in work settings."  20 C.F.R. Part 404, Subpart P, Appendix 1, § 12.00(C)(3).

affirm the ALJ's decision if "it is possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings[.]"  Wright v. Colvin, 789 F.3d 847, 852 (8th Cir. 2015) (quoting Perkins v. Astrue, 648 F.3d 892, 897 (8th Cir. 2011)).

    B.   Concentration, persistence, and pace

Plaintiff claims the ALJ erred in determining his RFC because, despite finding at steps two and three that he had moderate limitations in concentration, persistence, and pace, the ALJ did not account for those limitations in the RFC.  The Commissioner counters that the ALJ adequately accounted for Plaintiff's mental limitations by limiting him to "simple routine tasks, with few changes in [the] work setting … and no tandem tasks."

RFC is "the most [a claimant] can still do despite" his or her physical or mental limitations. 20 C.F.R. § 404.1545(a)(1).  See also Masterson v. Barnhart, 363 F.3d 731, 737 (8th Cir. 2004). "The ALJ should determine a claimant's RFC based on all relevant evidence including the medical records, observations of treating physicians and others, and an individual's own description of his limitations."  Moore v. Astrue, 572 F.3d 520, 523 (8th Cir. 2009) (quotation omitted).  "Because a claimant's RFC is a medical question, an ALJ's assessment of it must be supported by some medical evidence of the claimant's ability to function in the workplace."  Hensley v. Colvin, 829 F.3d 926, 932 (8th Cir. 2016) (quoting Cox v. Astrue, 495 F.3d 614, 619 (8th Cir. 2007)).

At steps and two and three of the sequential evaluation, the ALJ completed the PRT and found that Plaintiff had moderate limitations in the area of concentrating, persisting, or maintaining pace. (Tr. 16)  The ALJ explained:  "The claimant was able to follow along and answer questions appropriately at the hearing and his mental status examinations of record note intact cognitive functioning.  However, the claimant also reported sleep disturbance and testified that his panic episodes made it difficult to concentrate."  (Id.)  When formulating Plaintiff's RFC, the ALJ

accounted for his deficits in concentration, persistence, and pace by including limitations to "simple routine tasks, with few changes in work setting," "no tandem tasks," "infrequent and superficial interactions with supervisors and co-workers," and "no interaction with the general public." (Tr. 16-17)

Plaintiff argues that the ALJ's finding at steps two and three that Plaintiff was moderately limited in the area of concentration, persistence, and pace was inconsistent with her RFC analysis. The Eighth Circuit has held, however, that "the different steps serve distinct purposes, the degrees of precision required at each step differ, and our deferential standard of review precludes us from labeling findings as inconsistent if they can be harmonized." Chismarich v. Berryhill, 888 F.3d 978, 980 (8th Cir. 2018). "While the PRT is used at Steps Two and Three to determine whether a claimant's mental impairments are severe or meet a Listing, the RFC finding is made at Step Four to determine the most the claimant can do despite her functional limitations." Taylor v. Berryhill, No. 4:17-CV-1050-DGK-SSA, 2018 WL 5410977, at *3 (W.D. Mo. Oct. 29, 2018) (internal quotations omitted); compare 20 C.F.R. § 404.1520a, with 20 C.F.R. §§ 404.1520(a)(4)(iv), 404.1545.

Whether a limitation to "simple routine tasks" adequately accounts for a claimant's difficulties in concentration, persistence, or pace "is a fact-specific question." Ingle v. Berryhill, No. 1:16-CV-53 SPM, 2017 WL 4280672, at *7 (E.D. Mo. Sept. 27, 2017). Based on the record here, Plaintiff's limitations in concentration, persistence, or pace were not so significant that they required greater accommodations than those contained in the RFC. Plaintiff's treating psychiatrist noted that Plaintiff achieved a score of 27 on the ACT and was completing college course work in November 2007, February, March and June 2008, February 2009, and April 2013. (Tr. 216, 246-48). Plaintiff and his mother both testified that he received excellent grades in his college courses.

(Tr. 34-35, 43)  Plaintiff played the piano, played and developed video games, and, in February 2017, was teaching himself coding.  (See Tr. 214, 218-19, 221, 252, 254).  In mental status examinations completed between April 2017 and April 2018, Plaintiff's psychiatrist consistently observed that Plaintiff demonstrated normal memory, attention, and concentration.  (Tr. 261-65)  These activities, accomplishments, and clinical observations supported the ALJ's finding that Plaintiff's ability to concentrate, persistent, and maintain pace was sufficient to perform simple, routine tasks, with few changes in work setting, no tandem tasks, infrequent and superficial interactions with supervisors and coworkers, and no interaction with the general public.  See, e.g., Scott v. Berryhill, 855 F.3d 853, 857-58 (8th Cir. 2017) (RFC limiting "the complexity of tasks and the duration and complexity of supervision" sufficiently accounted for the plaintiff's attention and concentration deficiencies where the evidence showed that he watched television for three hours per day and demonstrated "good concentration and persistence during consultative examinations").

Citing Newton v. Chater, Plaintiff contends that limiting a claimant to simple work does not account for moderate deficiencies in concentration, persistence, and pace.  92 F.3d 688, 695 (8th Cir. 1996).  In that case, there was no dispute that the plaintiff suffered from deficiencies in concentration, persistence, or pace, as one expert described these limitations as "moderate" and another stated they were "marked[]."  Id. at 695.  The ALJ, however, formulated a hypothetical question that merely limited Plaintiff to "simple work," and the Eighth Circuit held that such limitation did not adequately describe the effects of Plaintiff's deficiencies in attention and concentration.[3]  Id.  Unlike the ALJ in Newton, the ALJ in this case did not merely limit Plaintiff

---

[3] In more recent decisions, the Eighth Circuit has recognized that an RFC assessment "need not contain much more than [that] at issue in Newton to sufficiently capture a claimant's limitations in concentration, persistence, or pace."  Scott, 855 F.3d at 857.  See also Gonzalez v. Saul, No.

to simple work, but specified that the work also must be routine, with no tandem tasks, changes in work setting, or interaction with the public and infrequent contact with supervisors and coworkers.

Plaintiff also relies on <u>Demoreuille v. Colvin</u>, No. 15-0528-CV-W-ODS-SSA, 2016 WL 4129117 (W.D. Mo. Aug. 3, 2016).  There, the Western District reversed and remanded on the ground that the limitations to "performing simple, routine, repetitive tasks," "occasional decision making and changes in the work setting" and "occasional[] interact[ion] with the public, workers supervisors" did not address the plaintiff's moderate difficulties in concentration, persistence, or pace.  <u>Id.</u> at * 2.  This Court, however, finds more persuasive the numerous cases from this District holding that limitations to tasks that are simple and routine adequately account for a plaintiff's moderate limitations in this area.  <u>See e.g.</u>, <u>Faint v. Colvin</u>, 26 F. Supp. 3d 896, 911-12 (E.D. Mo. 2014) (RFC's limitations to simple, unskilled work sufficiently accommodated the plaintiff's moderate limitations in concentration, persistence, or pace); <u>Salkic v. Saul</u>, No. 4:18-CV-1901 HEA, 2020 WL 805868, at *3 (E.D. Mo. Feb. 18, 2020) (limitations to "simple routine tasks" adequately captured the plaintiff's moderate limitations in concentration and attention); <u>Gonzalez v. Saul</u>, No. 4:19-CV-1429 SNLJ, 2020 WL 1873410, at *3-4 (E.D. Mo. Apr. 15, 2020) (limitation

---

4:19-CV-1429 SNLJ, 2020 WL 1873410, at *4 (E.D. Mo. Apr. 15, 2020) ("Cases since <u>Newton</u> demonstrate its limited reach."); <u>Mangano v. Berryhill</u>, No. 16-CV-147 KEM, 2017 WL 4322821, at *7 (N.D. Iowa Sep. 28, 2017) (distinguishing <u>Newton</u> and discussing later Eighth Circuit decisions).  For example, in <u>Howard v. Massanari</u>, the Eighth Circuit concluded that a hypothetical question describing a person capable of doing "simple, repetitive, routine tasks adequately captures [the plaintiff's] deficiencies in concentration, persistence, or pace."  255 F.3d 577, 582 (8th Cir. 2001).  In <u>Scott</u>, the Eighth Circuit held that an RFC provision for "medium, unskilled work involving 'personal contact that is incidental to the work performed,' requiring 'little independent judgment … [and] simple, direct, and … very brief' supervision… [and] tasks that can be learned by rote" sufficiently captured the plaintiff's deficiencies in concentration, persistence, or pace. 855 F.3d at 858.  <u>See also</u>  <u>Chismarich</u>, 888 F.3d at 980 (RFC including, among other things, the ability "to understand, remember, and carry out at least simple instructions and non-detailed tasks" and "work at a normal pace without production quotas" with limited interaction with other people was consistent with moderate difficulties in concentration, persistence, and pace).

to "simple and routine tasks" accounted for the plaintiff's limitation to "no more than moderate" limitations in concentration, persistence, and pace); King v. Berryhill, No. 1:18-CV-23 NCC, 2019 WL 1200334, at *5-6 (E.D. Mo. Mar. 14, 2019) (RFC limitation to "unskilled, simple, routine work" appropriately accommodated the plaintiff's moderate limitations in concentration and attention); Boyd v. Colvin, No. 4:15-CV-823 NAB, 2016 WL 3257779, at *5 (E.D. Mo. June 14, 2016) (RFC limitation to "simple, routine work consistent with 'unskilled' work" adequately accounted for the plaintiff's moderate limitations in concentration, persistence, and pace); Fleming v. Colvin, No. 4:15-CV-1150 SPM, 2016 WL 4493683, at *8 (E.D. Mo. Aug. 26, 2016) (RFC addressed the plaintiff's concentration deficit by limiting the plaintiff to "simple, repetitive tasks," "only occasional interaction with supervisors, co-workers and the public," and work "which does not require close attention to detail").[4]  Based on the record in this case and the foregoing case law, the Court finds that the ALJ's RFC determination adequately accommodated Plaintiff's moderate limitations in concentration, persistence, and pace.

C.  Treating psychiatrists

Plaintiff claims that the ALJ failed to properly evaluate the opinions of Plaintiff's treating psychiatrists, Drs. Berland and Lafferty.  More specifically, Plaintiff argues that the ALJ:  (1) failed to provide "good reasons" for her decision to assign Dr. Berland's opinion "little weight"; and (2) assigned "great weight" to Dr. Lafferty's assessment of Plaintiff's social and adaptation

---

[4] See also Boucher v. Saul, No. 4:19-CV-501 MDH, 2020 WL 5437741, at *3 (W.D. Mo. Sept. 10, 2020) (limitations to work that involved "understanding, remembering, and carrying out simple routine tasks, applying like information with no more than occasional changes in routine, and making simple decisions" adequately accommodated moderate limitations in concentration, persistence or pace); Mangano, 2017 WL 4322821, at *6-7 (limitations to "simple, routine work with simple instructions" sufficiently accounted for moderate limitations in concentration, persistence, and pace); Waxter v. Astrue, No. 10-563-CV-W-RED, 2011 WL 1327640, at *4 (W.D. Mo. Apr. 5, 2011) (ability to perform "simple, lower stress, repetitive work" adequately accounted for moderate limitations in concentration, persistence, and pace).

limitations but did not incorporate them in the RFC.  In response, the Commissioner asserts that: (1) the ALJ "provided a good explanation supported by substantial evidence" for her assessment of Dr. Berland's opinion; and (2) the ALJ's decision "amply accounts for" Dr. Lafferty's assessments that the ALJ credited.

A treating physician's opinion regarding a claimant's impairments is entitled to controlling weight where "the opinion is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record."[5]  Singh v. Apfel, 222 F.3d 448, 452 (8th Cir. 2000).  Even if the opinion is not entitled to controlling weight, it should not ordinarily be disregarded and is entitled to substantial weight.  Id.  This rule is premised, at least in part, on the notion that the treating physician is usually more familiar with a claimant's medical condition than are other physicians.  See 20 C.F.R. §§ 404.1527, 416.927; Thomas v. Sullivan, 928 F.2d 255, 259 n.3 (8th Cir. 1991).  "Although a treating physician's opinion is entitled to great weight, it does not automatically control or obviate the need to evaluate the record as [a] whole."  Leckenby v. Astrue, 487 F.3d 626, 632 (8th Cir. 2007) (quotation omitted).

If an ALJ declines to give controlling weight to a treating physician's opinion, the ALJ must consider the following factors in determining the appropriate weight: length and frequency of the treatment relationship; nature and extent of the treatment relationship; evidence provided by the source in support of the opinion; consistency of the opinion with the record as a whole; and the

---

[5] For claims filed on or after March 27, 2017, the regulations have been amended to eliminate the treating physician rule. The new regulations provide that the SSA "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from your medical sources," but rather, the SSA will consider all medical opinions according to several enumerated factors, the "most important" being supportability and consistency.  20 C.F.R. §§ 404.1520c, 416.920c.  Plaintiff filed his application in 2015, so the previous regulations apply.

source's level of specialization.  20 C.F.R. §§ 404.1527(c), 416.927(c).  Whether the ALJ grants a treating physician's opinion substantial or little weight, "[t]he regulations require that the ALJ 'always give good reasons' for the weight afforded to a treating physician's evaluation."  Reed v. Barnhart, 399 F.3d 917, 921 (8th Cir. 2005) (quoting 20 C.F.R. § 404.1527(d)(2)).

1.  Dr. Berland, treating psychiatrist November 2005 through May 2017

Plaintiff's medical records reflect that psychiatrist Dr. Berland began treating Plaintiff with medication and therapy in November 2005, when Plaintiff was fifteen years old.  While the frequency of the appointments varied, Dr. Berland generally saw Plaintiff every two to three months until his retirement in 2017.[6]  Dr. Berland's handwritten notes are generally brief and sometimes difficult to read, but they reflect improvement and stabilization in the later years of treatment.  For example, in January 2015, Plaintiff was "feeling more alive…like he has a brain" and was "better at controlling, getting away from anxiety."  (Tr. 221)  In October 2015, Plaintiff again reported he was feeling more relaxed, "things are okay" and he was "able to get out some." (Tr. 221)  Dr. Berland observed that Plaintiff's mood was "okay" and "affect full range."  (Id.)  In January 2016, Plaintiff continued to "get[] out of the house some" and described a recent trip to Minnesota to meet his girlfriend's family.  (Tr. 222)  In August 2016, Plaintiff stated that he had been going to parks to play Pokemon Go.  (Tr. 254)

At Plaintiff's next appointment with Dr. Berland in November 2016, they discussed Plaintiff's disability claim and the reasons Plaintiff believed he was unable to work.  (Id.) Although Plaintiff was experiencing depression and low motivation, his routine was "ok – brushed

---

[6] Plaintiff visited Dr. Berland three times in 2005, seven times in 2006, four times in 2007, five times in 2008, eight times in 2009, once in 2010, seven times in 2011 and 2012, twice in 2013, seven times in 2014, four times in 2015, five times in 2016, and twice in 2017.  (Tr. 213-22, 235-54, 270)

teeth every evening" and he had been playing video games and helping his girlfriend.  (Id.)  In February 2017, Plaintiff informed Dr. Berland that he had "not gotten out of [the] house," but he was "learning coding," "getting along very well" with his girlfriend, and sleeping better at night. (Tr. 254)

At Dr. Berland's final appointment with Plaintiff in May 2017, Plaintiff was "disciplining [himself] to complete some pinball table designs," teaching himself coding, and "[e]ating better and … preparing canned soups" for himself and his girlfriend.  (Tr. 270)  Plaintiff's sleep and physical hygiene had improved and Plaintiff "had been able to stop [his] buspirone and suffered no ill effects."  (Id.)

In February 2017, Dr. Berland completed a medical source statement (MSS) for Plaintiff, diagnosing him with severe anxiety.  (Tr. 233-34)  Dr. Berland wrote that Plaintiff was taking Wellbutrin, Prozac, Buspar, and Adderall, noting that he "functions ok at home with support from girlfriend – cannot leave house on his own."  (Id.)  On the checklist form, Dr. Berland opined that Plaintiff had "no useful ability to" be attentive/concentrate; follow work rules, noting "attendance is impossible"; deal with work stresses; function independently; demonstrate reliability; or understand, remember, and carryout simple job instructions.  (Tr. 234)  Where he was asked to rate Plaintiff's ability to make "performance adjustments," Dr. Berland wrote:  "he can do NOTHING within a reasonable, specified time limit."  (Id.) (emphasis in original)  In assessing Plaintiff's social functioning, Dr. Berland stated that Plaintiff had fair to "poor or no[]" ability to maintain personal appearance and "good" ability to behave in an emotionally stable manner, but wrote "he will avoid social situations."  (Id.)  Dr. Berland also wrote:  "[Plaintiff's] mental impairment prevents him from engaging in ANY activity that requires sustained mental effort on a predictable basis.  He cannot be employed."  (Tr. 233) (emphasis in original)

In her decision, the ALJ gave "little weight" to Dr. Berland's opinion, reasoning that Dr. Berland's statement that Plaintiff had no ability to function was inconsistent with the record as a whole.  (Tr. 19)  Plaintiff maintains that, by merely stating that Dr. Berland's opinion was inconsistent with the record, the ALJ failed to provide "good reasons" for discrediting Dr. Berland's opinion.  However, the ALJ cited evidence throughout the decision that undermined Dr. Berland's opinion.  See Sharp v. Saul, No. 4:19-CV-3275 SNLJ, 2020 WL 5547827, at *5 (E.D. Mo. Sept. 16, 2020) ("The ALJ is not required to mechanically repeat supportive evidence for each person that is given weight…").  For example, the ALJ observed that Plaintiff:  had no difficulty recalling his treatment history or understanding his treatment regimen; did not repeat classes, received mainly As and Bs; scored 27 on the ACT; completed some college courses; interacted appropriately with his mental healthcare providers; and followed along and answered questions appropriately at the hearing.  "[I]nconsistency with other evidence alone is sufficient to discount the opinion."  Goff v. Barnhart, 421 F.3d 785, 791 (8th Cir. 2005).  See also Stormo v. Barnhart, 377 F.3d 801, 805-06 (8th Cir. 2004) (treating physicians "are given less weight if they are inconsistent with the record as a whole").

The fact that Plaintiff was able to maintain employment (albeit remote work from his home) undermined Dr. Berland's opinion that he had no ability to function.  The ALJ noted that "Plaintiff's treatment notes show some references to employment related interactions" and Plaintiff testified that he had worked for a video game developer.  Evidence of employment during a period of alleged disability may be probative of a claimant's ability to work.  20 C.F.R. §§ 404.1571, 416.971 ("The work...that you have done during any period in which you believe you are disabled may show that you are able to work at the substantial gainful activity level....Even if the work you have done was not substantial gainful activity, it may show that you

are able to do more work than you actually did."). See also Harris v. Barnhart, 356 F.3d 926, 930 (8th Cir.2004).

The ALJ noted that Plaintiff's medical records reflected improvement in Plaintiff's condition, specifically "less frequent panic attacks" and improved hygiene and sleep.  (Tr. 18) "Impairments that are controllable or amenable to treatment do not support a finding of disability."  Davidson v. Astrue, 578 F.3d 838, 846 (8th Cir. 2009).  Finally, the Court notes that the infrequent and conservative nature of Plaintiff's treatment also undermined Dr. Berland's opinion as to the intensity and severity of Plaintiff's symptoms.  Dr. Berland only saw Plaintiff every three months from 2015 through May 2017.  The fact that Plaintiff's treatment was limited to medication and quarterly psychiatric appointments suggests that his symptoms were well controlled and supported the ALJ's finding that Plaintiff was less limited than Dr. Berland stated in the MSS.  See Milam v. Colvin, 794 F.3d 978, 985 (8th Cir. 2015) (the ALJ may properly weigh conservative treatment as a factor tending to disprove claimant's claims.).

Plaintiff contends that the ALJ ignored Dr. Berland's twelve-year treatment relationship with him and based her decision on only two treatment records, one of which described Plaintiff as "doing well."  Plaintiff correctly asserts that "doing well for the purposes of a treatment program has no necessary relation to a claimant's ability to work or to [a claimant's] work-related functional capacity."  Hutsell v. Massanari, 259 F.3d 707, 712 (8th Cir. 2001).

In her decision, the ALJ recognized that Dr. Berland was Plaintiff's treating physician and, while she did not provide a detailed discussion of Dr. Berland's treatment notes, it is clear that she reviewed them and considered the longitudinal treatment history.  See e.g., Chaney v. Colvin, 812 F.3d 672, 678 (8th Cir. 2016) ("[A]n ALJ's failure to cite specific evidence does not indicate that it was not considered.") (quotation omitted).  Moreover, the ALJ's finding that Plaintiff's condition

had improved was not based on notations that Plaintiff was "doing well," as Plaintiff suggests, but rather on reports that Plaintiff's panic attacks were less frequent and his sleep and hygiene had improved.  (See Tr. 18)  Based on the above, the Court finds that good reasons and substantial evidence supported the ALJ's decision to assign Dr. Berland's opinion little weight.[7]

2.  Dr. Lafferty, treating psychiatrist from April 2017 through April 2018

Plaintiff argues that the ALJ improperly assessed Dr. Lafferty's opinion because she assigned "great weight" to Dr. Lafferty's findings of mildly and moderately impaired social and adaptive functions but failed to accommodate them in the RFC.  The Commissioner maintains that the ALJ's RFC determination sufficiently accounted for the functional limitations identified by Dr. Lafferty and credited by the ALJ.

Dr. Lafferty assumed Plaintiff's treatment when Dr. Berland retired.  At Plaintiff's first appointment with Dr. Lafferty in April 2017, he informed her that his depression was worse during his teen years and "better now."  (Tr. 260)  He stated that he was a "video game developer" but did not get paid.  (Id.)  Dr. Lafferty observed that Plaintiff was cooperative with normal speech, logical thoughts, good judgment, and euthymic mood and affect, and she assessed a GAF score of 75.  (Tr. 11)

Dr. Lafferty's notes from her subsequent appointments with Plaintiff, which appear on checklist mental status examination forms, are generally brief and focused on medication management.  (Tr. 261-65)  In May 2017, Dr. Lafferty noted that Plaintiff had a normal fund of

---

[7] Plaintiff also points out that the ALJ incorrectly stated that "between February 2017 and April 2018, the claimant had only sought mental health treatment once, in May 2017."  (Tr. 18)  Contrary to the ALJ's statement, Plaintiff saw Dr. Lafferty four times in 2017 and twice between January and April 2018.  Because the ALJ provided other valid reasons for discounting Dr. Berland's opinion, the Court finds that this error was harmless.  See Byes v. Astrue, 687 F.3d 913, 917 (8th Cir. 2012) ("To show an error was not harmless, [a plaintiff] must provide some indication that the ALJ would have decided differently if the error had not occurred.").

knowledge and normal attention, concentration, and memory.  (Tr. 261)  Dr. Lafferty continued

Plaintiff's Adderall, Prozac, and Wellbutrin and prescribed Abilify.  (Tr. 261)  When Plaintiff

returned to Dr. Lafferty's office in July 2017, he had not started the Abilify because he did not

believe he needed it.  (Tr. 262)   Plaintiff reported that his mood and energy were "okay," he had

been exercising, and he did not want to adjust his medications.  (Id.)  Dr. Lafferty noted that

Plaintiff had a normal fund of knowledge, language, attention, concentration, and memory.  (Id.)

In October 2017, Plaintiff stated that he was anxious, but his mood and energy were "ok."  (Tr.

263)  Dr. Lafferty's examination again revealed that Plaintiff had normal memory, language,

attention, concentration, and fund of knowledge.  (Id.)

When Plaintiff returned to Dr. Lafferty's office in January 2018, he was "better" with "ok"

mood and concentration.  (Tr. 264)  He reported feeling "anxious – worr[ied]," but  he denied

panic and agreed to consider psychotherapy.  (Id.)  Dr. Lafferty noted that Plaintiff had normal

memory, language, attention, concentration, and fund of knowledge.  (Id.)  In April 2018, Plaintiff

reported "ok" mood, energy, and concentration, but felt "anxious" about his disability hearing.

(Tr. 265)  On examination, Dr. Lafferty observed that Plaintiff had normal memory, language,

attention, concentration, and fund of knowledge.  (Id.)

Later that month, Dr. Lafferty completed an MSS for Plaintiff.  Dr. Lafferty stated that she

provided Plaintiff medication management and support psychotherapy, and she diagnosed him

with "panic disorder, GAD, ADD, and BAD vs. MDD."  (Tr. 267)  In regard to Plaintiff's ability

to engage in sustained full-time employment, Dr. Lafferty wrote:  "Long term difficult to treat

anxiety interfering with gainful employment."  (Id.)  On a checklist of Plaintiff's functional

abilities, Dr. Lafferty noted no limitations in the area of concentration and performance and opined

that Plaintiff was moderately limited in his ability to:  interact appropriately with the general public

or customers; control emotions and deal with routine work related stressors; and sustain extended periods of employment without decompensation from periodic exacerbation of psychiatric symptoms.[8] (Tr. 268) Dr. Lafferty stated that Plaintiff was mildly limited in his ability to work in coordination with or close proximity to others and demonstrate reliability in a work setting.[9] (Id.) Finally, Dr. Lafferty estimated that Plaintiff would be off task due to his psychiatric impairments more than fifteen percent of the workday and would miss an average of three days of work per month. (Id.)

In her decision, the ALJ assigned "great weight" to Dr. Lafferty's opinion that Plaintiff had mild or moderate limitations in various areas of social interactions and adaptive functioning, explaining that they "are consistent with the record as a whole." (Tr. 19) However, the ALJ gave "less weight" to Dr. Lafferty's opinion that Plaintiff would be off task fifteen percent of the workday and would miss work at least three times per month, stating "the record does not support them." (Id.)

Plaintiff argues that, because the ALJ accepted Dr. Lafferty's assessment of Plaintiff's "moderate limitations," which meant the "the ability to perform the activity is only fair" and "can be performed most of the time but not consistently, no more than 2/3 of the work day," the ALJ was required to find that Plaintiff was disabled. The Court notes, however, that according to the MSS, moderate limitations in a particular area reduce, but do not preclude, a patient's functioning.

---

[8] The MSS form defined "moderate" limitation to mean: "Performance is significantly impaired in terms of proficiency and/or the ability to sustain the particular activity over the course of a workday/week. Indicates the activity can be performed most of the time but not consistently, no more than 2/3 of the work day." (Tr. 268) "Mild" meant that the "ability to perform the particular activity is slightly impaired." (Id.0

[9] Dr. Lafferty noted no limitations in Plaintiff's ability to: accept instructions and respond appropriately to criticism from supervisors; maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness; work independently at a competitive pace; or demonstrate reliability in a work setting. (Tr. 268)

Moreover, the ALJ accommodated Plaintiff's moderate limitations in the ability to interact with the general public or customers by including in the RFC "no interaction with the general public." She also accounted for Plaintiff's moderate limitations in dealing with routine work-related stressors by limiting Plaintiff to "few changes in work setting," "no tandem tasks," and "only infrequent and superficial interactions with supervisors and co-workers."

Plaintiff also briefly argues that the ALJ failed to provide support for her decision to discredit Dr. Lafferty's estimates that Plaintiff would be off task fifteen percent of the workday and would miss at least three days of work per month. As previously discussed, an ALJ is not required to identify the relied-upon evidence for every finding. See Sharp, 2020 WL 5547827, at *5. Earlier in her decision, the ALJ referenced Dr. Lafferty's mental status examinations which consistently showed normal mood and affect and intact attention, concentration, and memory. (Tr. 18) Dr. Lafferty's unremarkable clinical observations were inconsistent with her opinion that Plaintiff would be off task and/or absent too frequently to sustain competitive employment. The Court therefore finds that the ALJ did not err in assigning Dr. Lafferty's opinion partial weight.

**VI.    Conclusion**

For the reasons discussed above, the Court finds that substantial evidence in the record as a whole supports the Commissioner's decision that Plaintiff is not disabled. Accordingly,

**IT IS HEREBY ORDERED** that the final decision of the Commissioner denying Social Security benefits to Plaintiff is **AFFIRMED**.

A separate judgment in accordance with this Memorandum and Order is entered this date.

_Patricia L. Cohen_
PATRICIA L. COHEN
UNITED STATES MAGISTRATE JUDGE

Dated this 2nd day of December, 2020